**IN UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY**

C.J.,[1]

    **Plaintiff,**

v.                            **Civil Action No. _____**

**UNITED STATES OF AMERICA and
CORRECTIONS OFFICER JACOB SALCIDO,**

    **Defendants.**

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, C.J., was sexually assaulted and battered while incarcerated at the federal prison in Lexington, Kentucky, known as the Federal Medical Center, Lexington ("FCI," "FMC," or "FMC-L"). By and through her attorneys, she brings claims based upon the Eighth Amendment to the United States Constitution pursuant to the legal standards set forth in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2D 619 (1971), and based upon the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq*., 28 U.S.C. § 1983, *et seq.,* and/or other applicable law. For her complaint against Defendants, C.J. states as follows:

**PARTIES**

1.    Plaintiff, C.J., was at all times relevant to this complaint in the custody of the Federal Bureau of Prisons ("BOP"), including at FMC-L, which is the prison facility located within the Eastern District of Kentucky where the sexual assaults described herein occurred.

---

[1]   These initials, and all initialized references to inmate victims of sexual assault at FCI, are pseudonyms used to protect the subjects' identities for personal safety reasons. Plaintiff is proceeding under this pseudonym to protect her identity as a sexual assault victim. These persons have legitimate fears of retaliation from correctional officials and/or present or former inmates for making public allegations regarding correctional officers.

2. Defendant, the United States of America, is a sovereign entity named herein pursuant to the Federal Tort Claims Act and oversees the Federal Bureau of Prisons ("BOP"), which is responsible for the custody and care of federal inmates.

3. FMC-L wardens, associate wardens, executive staff, department heads, supervisors, counselors, professional service providers and prison management (hereinafter "FMC-L Management Team") were grossly negligent in the management, supervision, and retention of male corrections officers at FMC-L resulting in the sexual harassment and abuse of female inmates.

4. The Special Investigative Unit ("SIS") assigned to FMC-L was responsible for the investigation of any alleged criminal activity involving staff members or inmates. SIS members were grossly negligent and derelict in their duties to manage, supervise, and investigate male officers at FMC-L resulting in the sexual harassment and abuse of female inmates.

5. The Office of Internal Affairs ("OIA"), the Office of Inspector General ("OIG"), the U.S. Department of Justice ("DOJ"), and many other special agents and supervisory attorneys were responsible for the investigation and prosecution of male correctional officers sexually abusing female inmates at FMC-L. These agencies failed to timely investigate and prosecute the criminal activity perpetrated by the male correctional officer identified below. (SIS, OIA, OIG, and DOJ are collectively referred to herein as the "Prison Investigative Agencies").

6. Defendant, Jacob Salcido, was at times relevant to this complaint employed by the BOP as a correctional officer working at FCI Lexington (hereinafter "FCI") in Kentucky.

7. Defendant Salcido was at all times relevant to this complaint acting under color of law and within the scope of his employment with the United States BOP.

2

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 & 1346 (b)(1) as the claims in this case are brought against the United States of America under the Federal Tort Claims Act 28 U.S.C. § 2671, *et seq.* and against the individual Defendant under the Eighth Amendment to the United States Constitution, pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388 (1971).

9.     Plaintiff filed an Administrative Claim (SF-Form 95), which was dated February 9, 2022.  By letter dated August 10, 2022, from the Federal Bureau of Prison's Mid-Atlantic Regional Office, the claim was denied. Consequently, Plaintiff has exhausted all obligatory administrative remedies, and her FTCA claim is ripe for the filing of this civil action.

10.    Venue is appropriate in this Court pursuant to 28 U.S.C. § 1402(b), as some or all of the events upon which this action is based occurred in the Eastern District of Kentucky.

## FACTS

### FEDERAL BUREAU OF PRISONS

11.    The Federal Bureau of Prisons ("BOP") is a United States federal law enforcement agency responsible for the custody of individuals who have violated federal laws.  BOP's stated mission is to "protect public safety by ensuring that federal offenders serve their sentences of imprisonment in facilities that are safe, humane, cost efficient and appropriately secure…"[2] BOP employes over 35,000 individuals at 122 institutions across the country.  BOP is currently responsible for the custody and care of over 13,000 female inmates incarcerated at 27 separate BOP facilities.

---

[2] https://www.bop.gov/about/agency/

12.     Contrary to its mission statement, BOP has created and maintained a sanctuary for male correctional officers to sexually assault and abuse female inmates.  The sexual abuse of female prisoners in the care and custody of BOP is epidemic and largely unchecked as a result of cultural tolerance, orchestrated cover-ups, and organizational reprisals of inmates brave enough to report sexual abuse.

13.     The U.S. House of Representative Committee on Oversight and Government Report recently released the findings of its investigation into the systemic misconduct within BOP.  The report concluded that misconduct by prison officials is "largely tolerated or ignored altogether"[3] allowing officials to operate outside of the rules. The Committee reviewed specific cases where "individuals deemed responsible for misconduct were shuffled around, commended, awarded, promoted or even allowed to retire with a clean record and full benefits before any disciplinary action could apply."[4]

14.     In October 2022, an investigation by the OIG found the Office of Internal Affairs of the Bureau of Prisons will only consider inmate testimony when a case is accepted for criminal prosecution or if it is substantiated by video, conclusive forensic evidence, or a confession.[5]  If a sexual assault allegation against an employee depends on an inmate's account, then BOP does not pursue a misconduct case even when multiple inmates offer corroborating testimony.[6] The OIG warned that BOP's approach was enabling problematic employees to remain on staff, thereby increasing "the risk of serious harm to inmates."[7]

---

[3] https://republicans -oversight.house.gov/wp-content/uploads/2019/01/Memo-to-Chairman-Russell-re-BOP.pdf
[4] *Id.*
[5] Exhibit 1, Department of Justice Office of the Inspector General, "Management Advisory Memorandum 23-001"
[6] *Id.*
[7] *Id.*

4

15.    In December 2022, the U.S. Senate Permanent Subcommittee on Investigations released its report on sexual abuse of female inmates in federal prisons.[8]  The Subcommittee found:

- BOP employees sexually abused female prisoners in at least two-thirds (19 of 29 facilities) of federal prisons that have held women over the past decade.

- BOP has failed to successfully implement the Prison Rape Elimination Act ("PREA"). It failed to prevent, detect, and stop recurring sexual abuse in at least four federal prisons, including abuse by senior prison officials.

- BOP management failures enabled continued sexual abuse of female prisoners by BOP's own employees.

- BOP Office of Internal Affairs' investigative practices are seriously flawed.  There is currently a backlog of 8,000 internal affairs cases, including at least hundreds of sexual abuse cases.

## PRISON RAPE ELIMINATION ACT

16.    The Prison Rape Elimination Act ("PREA") was signed into law by President Bush in 2003 and applies to all federal facilities managed by BOP. P.L. 108-79. PREA's goal is to deter the sexual assault of prisoners and to curb prison rape through a zero-tolerance policy.

17.    Because the female inmates are fully dependent on the correctional officers for basic necessities and privileges, all sexual contact, with or without the consent of the inmate, is classified as abuse.  Sexual abuse and sexual harassment are defined in section 115.6 of the Act as follows:

---

[8] Exhibit 2, Sexual Abuse of Female Inmates In Federal Prisons, Staff Report, Permanent Subcommittee of Investigations United States Senate.

Sexual abuse of an inmate, detainee, or resident by staff member, contractor, or volunteer includes any of the following acts, with or without consent of the inmate, detainee, or resident:

(1) Contact between the penis and the vulva or the penis and the anus, including penetration, however slight;

(2) Contact between the mouth and the penis, vulva, or anus;

(3) Contact between the mouth and any body part where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;

(4) Penetration of the anal or genital opening, however slight, by a hand, finger, object, or other instrument, that is unrelated to official duties or where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;

(5) Any other intentional contact, either directly or through the clothing, of or with the genitalia, anus, groin, breast, inner thigh, or the buttocks, that is unrelated to official duties or where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;

(6) Any attempt, threat, or request by a staff member, contractor, or volunteer to engage in activities described in paragraphs (1)-(5) of this section;

(7) Any display by a staff member, contractor, or volunteer of his or her uncovered genitalia, buttocks, or breast in the presence of an inmate, detainee, or resident, and

(8) Voyeurism by a staff member, contractor, or volunteer.

Sexual harassment includes:

(1) Repeated and unwelcome sexual advances, requests for sexual favors, or verbal comments, gestures, or actions of a derogatory or offensive sexual nature by one inmate, detainee, or resident directed toward another; and

(2) Repeated verbal comments or gestures of a sexual nature to an inmate, detainee, or resident by a staff member, contractor, or volunteer, including demeaning references to gender, sexually suggestive or derogatory comments about body or clothing, or obscene language or gestures.

18.     As mandated by PREA, the BOP conducts annual PREA audits ("Audits") at each federal prison facility. The annual Audits for FMC-L are materially incomplete as the auditors failed to interview any female inmates that were involved in or witness to PREA violations.

19.     The reports suggest that these female inmates were not available for interview as they had been transferred to another prison facility. The failure to interview victims of PREA violations undermines the Audit results and incentivizes FMC-L to transfer victims of sexual abuse rather than cooperate with a thorough PREA investigation. By transferring victims of sexual abuse, FMC-L shields itself from legitimate investigation and suppresses complaints by punishing the victims.

20.     The FMC-L transfer policy also demonstrates the BOP's failure to put the rights of the victims ahead of its own economic interest. Before any BOP employee can be punished, transferred or reassigned for sexual abuse, administrators must carefully navigate the collective bargaining agreement. In almost every instance, the collective bargaining rights of the employees outweigh the rights of the victim, and it is the victim who receives the full weight of punishment by transfer to another facility or other punitive measures. In no other context are the rights of the sexually abused subordinated to the economic interests of the institution and the collective bargaining rights of the abusers.

21.     PREA "is intended to make confinement facilities free from sexual abuse and its threat."[9] PREA audits assess whether an institution is compliant with the 45 PREA standards by reviewing policies and practices within the institution, interviewing employees and prisoners, and

---

[9] Bureau of Justice assistance, *Prison Rape Elimination Act Auditors: Information and Resources (Nov. 2021)(https://www.prearesourcecenter.org/sites/default/files/PREA-Auditors-FS.pdf).*

reviewing documentation from the audit period, such as prisoner complaints of sexual abuse or harassment.[10]

22.     According to Beth Reese, Chief of the Office of Internal Affairs, and Regional Director Rios, complaints of sexual abuse against BOP employees can suggest whether a region, group of facilities, individual facility, or employee merits additional scrutiny. BOP is required by law to collect and analyze complaint data; BOP does not systematically use it to prevent and/or detect sexual abuse of female prisoners by employees.[11]

**FMC-L**

23.     FMC-L is a federal prison facility operated by the BOP through the United States Department of Justice.

24.     FMC-L is one of the 19 federal prisons where multiple BOP employees were known to have sexually abused multiple female prisoners.[12]

25.     Female inmates at FMC-L are segregated into distinct housing units with dormitory style cubicles for each inmate. Many inmates are afforded work, educational and vocational privileges within the complexes. Inmates are subject to daily "counts" but are given some basic freedoms to move and work on the complex.

26.     FMC-L employs correctional officers, facilities staff and management to oversee and operate the prison facility.  The correctional officers are trained, managed, overseen and paid by BOP through the United States Department of Justice serving "investigative or law enforcement" functions.  The correctional officers are federal employees subjecting the United

---

[10] Exhibit 2, Sexual Abuse of Female Inmates In Federal Prisons, Staff Report, Permanent Subcommittee of Investigations United States Senate.
[11] *Id.*
[12] *Id.*

8

States of America to liability for improper actions committed within the course and scope of their employment, under color of federal law, or in violation of specific federal statutes.

27.     Defendant Salcido was a known sexual predator to the FMC-L Management Team and the Prison Investigative Agencies. Upon information and belief, Defendant Salcido had been investigated on numerous occasions for sex crimes against female inmates. The FMC-L Management Team and Prison Investigative Agencies were well aware of the female inmates' reluctance to come forward with information on sexual abuse for fear of reprisal, including, but not limited to, transfer to a different facility, disciplinary segregation, loss of early release rights, detrimental write-ups, loss of work privileges, and interference with vocational skills programs.

28.     In fact, the FMC-L Management Team instituted a policy whereby inmates complaining of mistreatment by prison officials were removed to a local county detention center or a special housing unit. This relocation policy intentionally suppressed complaints of misconduct as the county facilities are higher levels of security and do not permit work details or vocational training.

29.     Despite the known issue of abuse, the FCM-L Management Team granted Defendant Salcido unrestricted and unsupervised contact with Plaintiff including work details which granted him one-on-one access. Defendant Salcido abused his position of authority to rape Plaintiff.

**PROGRAM STATEMENT 3420.11**
**STANDARDS OF EMPLOYEE CONDUCT**

30.     Many of the BOP's policies are contained in documents titled "program statements" which set forth rules and procedures that all BOP employees are required to follow.

31.     Program Statement 3420.11 sets out the duties and responsibilities of all BOP employees.  It requires that employees, "[A]s soon as practicable (but no later than 24 hours)

9

report to their CEO (or other appropriate authority such as the Office of Internal Affairs or the Office of the Inspector General) any violation, appearance of a violation, or attempted violation of these Standards or of any law, rule, or regulation.  Every employee is required to immediately report to management any act or omission by any person that could result in a breach of institution security.  Failure by employees to follow these regulations and policy or any other Bureau policy or relevant regulation(s) could result in disciplinary action, up to and including removal."

32.     Program Statement 3420.11 (Standards of Employee Conduct) mandates that "[n]o employee shall engage in, or allow another person to engage in, sexual behavior with an inmate. There is never any such thing as *consensual* sex between staff and inmates."

33.     Program Statement 3420.11 states that BOP employees are subject to administrative action, up to an including removal, for any inappropriate contact, sexual behavior, or relationship with inmates, regardless of whether such contact constitutes a prosecutable crime. Physical contact is not required to subject an employee to sanctions for misconduct of a sexual nature.

34.     Program Statement 3420.11 goes on to state that "Title 18, U.S. Code Chapter 109A provides penalties of up to life imprisonment for sexual abuse of inmates where force is used or threatened.  Sexual contact is defined as the intentional touching of the genitalia, anus, groin, breast, inner thigh, or buttocks with the intent to abuse, humiliate, harass, degrade, arouse, or gratify the sexual desire of any person.  All allegations of sexual abuse will be thoroughly investigated and, when appropriate, referred to authorities for prosecution."

35.     Each new BOP employee, contractor, and volunteer must receive and sign a form acknowledging receipt of Program Statement 3420.11.

36.    Program Statement 5324.12 (Sexually Abusive Behavior Prevention and Intervention Program) concerning the prevention of, and intervention upon sexually abusive behavior, implements zero tolerance toward all forms of sexual activity, including sexual abuse and sexual harassment, and provides guidelines to address prohibited and/or illegal sexually abusive behavior.

37.    Program Statement 5324.12 is the controlling BOP policy addressing the prevention of, and intervention upon, sexually abusive behavior.  It is disseminated agency-wide and applies to all facilities operated by the BOP and every staff member working within each correctional facility.

38.    Program Statement 5324.12 lays out duties and responsibilities with respect to conduct for all BOP employees, and mandates particular staff and agency reporting duties with respect to sexually abusive behavior, including concerning incidents or possible incidents of sexual abuse or sexual harassment:  it mandates that "[a]ll staff must report information concerning incidents or possible incidents of sexual abuse or sexual harassment to the Operations Lieutenant, or where appropriate, in accordance with the Program Statement 3420.11."

39.    BOP policy requires the training of all employees who may have contact with inmates on how to fulfill their responsibilities under agency sexual abuse and sexual harassment prevention, detection, reporting, and response policies and procedures.

40.    Inmates, employees, and the public may file a complaint at the BOP facility where an incident of sexual abuse occurred; through BOP's Office of Internal Affairs ("OIA"); or with the Department of Justice Office of Inspector General ("OIG").  In accordance with the agency's own Standards of Employee Conduct, BOP employees must report any violation of those Standards, or any rule or law within one business day of the incident to their Chief Executive

11

Officer ("CEO"), OIA, or the OIG. Decisions regarding disciplinary action in cases where the allegations are sustained are managed by BOP's Human Resources Management ("HRM") and BOP's Office of General Counsel.

**SEXUAL HARASSMENT AND RAPE OF PLAINTIFF**

41.     As a federal inmate, C.J. was committed to the Government's care, custody, and control and while in such custody, federal law specifically requires the BOP to "provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States" and to "provide for the protection ... of all persons charged with or convicted of offenses against the United States."  18 U.S.C. § 4042(a)(2)-(3).

42.     In September 2020, C.J. was placed on a 21-day quarantine pending her release from FMC-L. Inmates on quarantine were housed on the third floor of the administrative building on the women's side of the facility in closet-like cells that were repurposed for isolation of inmates pending their release.

43.     During the period in which C.J. was housed in isolation, a number of guards normally assigned elsewhere at the facility were assigned to perform extra shifts in the women's quarantine area as well as other areas of the women's side of the facility due to staffing shortages. Corrections Officer Salcido was one of the officers assigned to work extra shifts in the women's quarantine area and was assigned to the night shift.

44.     Officer Salcido made suggestive and sexualized comments toward Plaintiff, which she rebuffed.

45.     Plaintiff reported Officer Salcido's unwelcomed sexual comments to Corrections Counselor Cheney.

46.     Corrections Counselor Cheney downplayed Plaintiff's report of sexual harassment and told Plaintiff she was "just imagining" the sexual harassment.

47.     As a federal inmate, C.J.'s options for escaping sexual assault or for resisting the sexually abusive conduct of a correctional officer or other BOP employee were limited.  C.J. — like all inmates at FMC-L — relied on employees, like Counselor Cheney, to protect her from sexual abuse by guards and other staff.

48.     During Officer Salcido second shift working on the quarantine unit since Plaintiff was transferred to that unit, he entered her "cell" around 3 a.m. and grabbed Plaintiff's wrists and overpowered her, raping her vaginally on the cot.  Plaintiff attempted to fight Officer Salcido off in an effort to avoid being raped; however, Officer Salcido was much larger than Plaintiff.

49.     Plaintiff discussed the rape by Officer Salcido with two other inmates on the quarantine unit and was advised that reporting the rape could result in delay in Plaintiff's release from the facility. Both inmates indicated that they had also been sexually assaulted by Officer Salcido.

50.     Shortly before being released, Plaintiff reported the rape to a nurse employed by an outside contractor to provide Covid care at the facility. The nurse reported the rape to prison staff.

51.     In response to the nurse's report regarding the rape of Plaintiff, Counselor Cheney provided Plaintiff with administrative remedy request forms and asked if Plaintiff "needed anything."

52.     Plaintiff did not consent or give permission to Officer Salcido to touch or engage in any sexual activity, nor could she have, as a matter of law. As a result of the sexual assault and harassment from Officer Salcido, Plaintiff has suffered extensive psychological trauma, depression, pain and suffering, physical trauma, anxiety, and humiliation. Plaintiff demands

13

compensation from the United States of America for the abuse in an amount to be determine at trial.

## COUNT I – CLAIMS AGAINST SALCIDO PURSUANT TO THE EIGHTH AMENDMENT TO THE UNITED STATES CONSITUTION

53.    C.J. re-alleges and incorporates by reference all of the preceding allegations as if set forth herein.

54.    As an inmate in the custody of the United States BOP, C.J. had a clearly established right under the Eighth Amendment to the United States Constitution not to be subjected to cruel and unusual punishment while incarcerated.

55.    Defendant Salcido's actions constitute cruel and unusual punishment in the forms of sexual abuse, assault, battery and rape.

56.    C.J. was not sentenced with a prescription for any form of sexual abuse; it is not a legitimate form of punishment.  It is not an ancillary component of any prison sentence, and it serves no legitimate penal purpose.

57.    All of Defendant Salcido's acts and omissions were taken while acting under color of law and in the scope and course of his position as a correctional officer.

58.    Defendant Salcido, individually, failed in his duty to provide C.J. with constitutionally safe and secure conditions or confinement.

59.    FMC-L Counselor Cheney was aware that Defendant Salcido was sexually harassing Plaintiff prior to Officer Salcido raping Plaintiff.  Counselor Cheney dismissed Plaintiff's allegations of sexual harassment and Officer Salcido continued to have unsupervised access to Plaintiff.

60.    Defendant Salcido acted intentionally, maliciously, oppressively and/or with gross negligence against Plaintiff's constitutional rights.

14

61.     As a direct and proximate result of Defendant Salcido's misconduct, C.J. was subjected to physical and emotional injury, depression, post-traumatic stress, embarrassment, and other damages, all or some of which shall continue indefinitely or permanently, as well as retaliation.

62.     Defendant Salcido's conduct was of such a quality and nature as to warrant his liability for punitive damages, in accordance with applicable law.

63.     C.J. is also entitled to recover from Defendant Salcido all compensatory damages recognized by applicable law.

## COUNT II – CLAIMS AGAINST THE UNITED STATES OF AMERICA UNDER THE FTCA: NEGLIGENCE

64.     C.J. re-alleges and incorporates by reference all of the preceding allegations as if set forth herein.

65.     Defendant the United States of America is responsible for the oversight of its employees, which includes officers and staff at federal correctional institutions, including FMC-L.

66.     Pursuant to the Federal Tort Claims Act, the United States is liable for damages caused by the negligent or wrongful acts of its employees acting within the scope of their employment, under circumstances where the United States, if a private person, would be liable in accordance with the laws of the State of Kentucky.

67.     Federal law specifically requires the BOP to "provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States" and to "provide for the protection . . . of all persons charged with or convicted of offenses against the United States."  18 U.S.C. § 4042(a)(2)-(3).

15

68.    Defendant United States and the supervisors and employees of FMC-L have a duty to provide inmates, being in their custody, with a safe and secure environment, free of dangers, including the dangers of sexual harassment and sexual assault.

69.    As a premises owner/operator, the United States has a duty to provide inmates with a reasonably safe place, which specifically includes a place reasonably free and safe from known or suspected sexual abusers and rapists and/or individuals who pose a foreseeable risk of sexual abuse or rape.

70.    Correctional officers and other prison officials and representatives at FMC-L have a non-discretionary duty, pursuant to PREA, to enforce a policy of "zero-tolerance" with respect to sexual abuse of inmates by staff.

71.    Correctional officers and other prison officials and representatives at FMC-L have a duty to protect inmates from harm caused by correctional officers, and other prison officials and representatives, specifically including Defendant Salcido.

72.    Correctional officers and other prison officials and representatives at FMC-L have a duty to disallow or sufficiently monitor and supervise one-on-one interactions between inmates and prison representatives such as Defendant Salcido.

73.    Correctional officers and other prison officials and representatives at FMC-L have a duty to house inmates in a safe and secure manner.

74.    FMC-L Counselor Cheney was aware that Defendant Salcido was sexually harassing Plaintiff prior to Officer Salcido raping Plaintiff.  Counselor Cheney dismissed Plaintiff's allegations of sexual harassment and Officer Salcido continued to have unsupervised access to Plaintiff.

16

75.     Pursuant to 28 C.F.R. § 115.31, FMC-L Management Team and the Prison Investigative Agencies have a non-discretionary duty to train employees on how to prevent sexual abuse and sexual harassment, the right of inmates to be free from sexual abuse and harassment, the dynamics of sexual abuse and harassment, the common reactions of sexual abuse and harassment victims, and how to detect and respond to signs of threatened and actual sexual abuse and to ensure that such training was properly followed.  FMC-L Management Team and the Prison Investigative Agencies breached this duty, and such breach was a proximate cause of the injuries and damages alleged herein.

76.     Pursuant to 28 C.F.R. §§ 115.31 and 115.33, FMC-L Management Team and the Prison Investigative Agencies have a non-discretionary duty to train employees and advise inmates of their right to be free from retaliation for reporting incidents of sexual harassment and sexual abuse by BOP employees and representatives and to ensure that such training was properly followed.  Plaintiff was retaliated against, and therefore FMC-L Management Team and the Prison Investigative Agencies breached this duty, and such breach was a proximate cause of the injuries and damages alleged herein.

77.     Pursuant to 28 C.F.R. §115.17, FMC-L Management Team and the Prison Investigative Agencies have non-discretionary duties with respect to the hiring, promotion, and periodic review of their employees.  Those non-discretionary duties include duties to consider any incidents of sexual harassment, whether the employee has engaged in sexual abuse, and whether the employee has been convicted or civilly adjudicated of sexual abuse.  Upon information and belief, FMC-L Management Team and the Prison Investigative Agencies failed to perform their non-discretionary duties with respect to Defendant Salcido or failed to appropriately, responsively act if they did perform such duties.

17

78.     BOP supervisory officials have a duty to monitor, supervise, train, and discipline employees/representatives at FMC-L, specifically including Defendant Salcido, in order to ensure that staff/representatives properly perform their PREA-mandated duties so that inmates' Eighth Amendment rights are not violated.

79.     Prison officials at FMC-L knew or should have known that Defendant Salcido should not have been permitted to have unsupervised access to inmates, including C.J., to whom he posed an excessive and unreasonable risk.

80.     The FMC-L Management Team and the Prison Investigative Agencies breached their duties to Plaintiff under PREA as follows:

- Section 115.11 failing to enforce zero tolerance policy
- Section 115.13 failing to supervise and monitor (video surveillance) one-on-one inmate/officer contact
- Section 115.15 permitting improper cross-gender pat downs
- Section 115.17 hiring, promoting, and retaining officers who "may" have had improper sexual contact
- Section 115.43 punishing sex victims with involuntary segregated housing, loss of privileges, and work permits
- Section 115.61 failing to report suspicion of sexual abuse
- Section 115.67 failing to protect inmates from retaliation after reporting abuse
- Section 115.76 failing to discipline staff for sexual misconduct

81.     Through the conduct of Defendant Salcido and other BOP employees/representatives, all of the duties encompassed by this count were breached, and as a proximate result Plaintiff sustained injuries and damages.

82.     As a direct and proximate result of these breaches of duties, C.J. suffered personal injuries associated with and arising from multiple sexual assaults and rape including, but not

limited to, severe physical and emotional injury, depression, post-traumatic stress, embarrassment, and other damages, all or some of which shall continue indefinitely or permanently, as well as retaliation.

**COUNT III – CLAIMS AGAINST SALCIDO FOR VIOLATIONS OF THE LAWS AND CONSTITUTION OF KENTUCKY AND THE UNITED STATES IN VIOLATION OF 42 U.S.C. § 1983**

83.     Plaintiff re-alleges and incorporates by reference all the preceding allegations as if set forth herein.

84.     The laws and constitutions of the State of Kentucky and the United States of America, including, but not limited to 42 U.S.C § 1983 and the Eighth Amendment to the United States Constitution include provisions prohibiting cruel and unusual punishment.

85.     As described above, Defendant Salcido has violated clearly established laws of the State of Kentucky and the United States of America in his actions toward Plaintiff.

86.     Defendant Salcido was acting under color of law as described above during his actions.

87.     Because the actions of Defendant Salcido involved "a reckless or callous indifference to the federally protected rights of" Plaintiff, an award of punitive damages is appropriate to the fullest extent permitted by law. *See Morning v. Dillon Cty.*, No.: 4:15-cv-03349-RBH-TER, 2018 U.S. Dist. LEXIS 163072, at *12 (D. S.C. Jun. 12, 2018) (quoting *Smith v. Wade*, 461 U.S. 30 (1983)).

88.     Defendant Salcido was acting in his capacity as a prison official, under color of law, when he committed these acts in violation of clearly established laws of the State of Kentucky and the United States as described above and including, but not limited to, the Eighth Amendment to the United States Constitution.  Accordingly, under 42 U.S.C. § 1983 and similar doctrines

19

adopted by the State of Kentucky, Defendant Salcido is liable for the damages resulting from Plaintiff's injuries and pain and suffering.

89.     Defendant Salcido deprived Plaintiff of significant legal rights in violation of 28 U.S.C. § 1983 as described in the factual assertions mentioned above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Honorable Court grant her the following relief:

1.     Compensatory and special damages as to all Counts;

2.     Punitive damages as to Count I and Count III against Defendant Salcido, and not as to any Count against the United States of America;

3.     Reasonable attorneys' fees and costs in accordance with applicable law, including costs incurred in this action and reasonable attorney fees under 42 U.S.C. § 1988 and in accordance with 42 U.S.C § 1983; and attorney fees and costs as allowed by any and all other applicable legal authority;

4.     Pre-judgment and post-judgement interest as allowed by law; and,

5.     Such other further relief as this Court in its discretion deems just.

## JURY DEMAND

Plaintiff hereby demands a jury trial on any and all Counts so triable under applicable law.

**C.J.,**
By Counsel

/s/David G. Bryant
David G. Bryant, Esq.
**DAVID BRYANT LAW, PLLC**
600 W. Main St., Ste. 100
Louisville, KY 40202
Telephone:  (502) 540-1221
david@davidbryantlaw.com
/s/ L. Dante diTrapano
L. Danté diTrapano, Esq. (WVSB# 6778)

20

Amanda J. Davis, Esq. (WSB# 9375)
**CALWELL LUCE DITRAPANO, PLLC**
500 Randolph Street
Charleston, WV 25302
Telephone: 304-343-4323
Fax: 304-344-3684
dditrapano@cldlaw.com
adavis@cldlaw.com

*/s/Jay T. McCamic*
Jay T. McCamic, Esq. (WVSB# 2386)
**MCCAMIC LAW FIRM, PLLC**
80 12th Street, Ste. 305
P.O. Box 151
Wheeling, WV 26003
Telephone: 304-238-9460
Fax: 304-830-5324
jay@mccamic.com

*/s/Anthony I. Werner*
Anthony I. Werner, Esq. (WVSB# 5203)
**JOHN & WERNER LAW OFFICES, PLLC**
Board of Trade Building, STE 200
80 - 12th Street
Wheeling, WV 26003
Telephone: 304-233-4380
Fax: 304-233-4387
awerner@johnwernerlaw.com

*/s/W. Jesse Forbes*
W. Jesse Forbes, Esq. (WVSB# 9956)
**FORBES LAW OFFICES, PLLC**
1118 Kanawha Blvd., East
Charleston, WV  25301
Telephone: 304-343-4050
Fax: 304-343-7450
wjforbes@forbeslawwv.com
(*pro hac vice admission to be sought*)